**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GERALDINE K. RICHTER,
Plaintiff-Appellant,

v.

CAPP CARE, INC.,

No. 94-2660

Defendant-Appellee.

AMERICAN ASSOCIATION OF PREFERRED
PROVIDER ORGANIZATIONS,
Amicus Curiae.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-94-614-A)

Argued: December 6, 1995

Decided: February 26, 1996

Before HALL, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Timothy Dean Barto, RICHTER, MILLER & FINN,
Washington, D.C., for Appellant. John Mark Murdock, EPSTEIN,
BECKER & GREEN, P.C., Washington, D.C., for Appellee. **ON
BRIEF:** Douglas L. Elden, Robbin C. Elden, DOUGLAS L. ELDEN
& ASSOCIATES, Chicago, Illinois, for Amicus Curiae.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Plaintiff/Appellant, Geraldine K. Richter, M.D., is a physician and orthopedic surgeon engaged in the private practice of medicine and orthopedic surgery in Northern Virginia. Defendant/Appellee, Capp Care, Inc., is a managed health care company (i.e., a preferred provider organization or "PPO"). Dr. Richter sued Capp Care, claiming that Capp Care violated the Any Willing Provider Law, Va. Code Ann. § 38.2-3407, by refusing to accept her as a preferred provider in Capp Care's new Northern Virginia PPO.

Virginia's Any Willing Provider Law provides in pertinent part that:

> A. One or more insurers may offer or administer a health benefit program under which the insurer or insurers may offer preferred provider policies or contracts that limit the numbers and types of providers of health care services eligible for payment as preferred providers.

> B. Any such insurer shall establish terms and conditions that shall be met by a hospital [or] physician. . . in order to qualify for payment as a preferred provider under the policies or contracts. These terms and conditions shall not discriminate unreasonably against or among such health care

2

> providers. No hospital [or] physician . . . willing to meet the
> terms and conditions offered to it or him shall be excluded.
> . . .

Va. Code Ann. § 38.2-3407.**1**

After a bench trial the district court entered judgment in favor of
Capp Care. See Richter v. Capp Care, Inc., 868 F. Supp. 163 (E.D.
Va. 1994). The court held that Capp Care was not subject to the pro-
visions of section 38.2-3407 because Capp Care is not as insurer.
Also, the court held that even if Capp Care was subject to the provi-
sions of section 38.2-3407, Capp Care did not violate that section
when it denied Dr. Richter's application to become a preferred pro-
vider. Dr. Richter now appeals.

I.

By its terms, section 38.2-3407 applies only to"[o]ne or more
insurers . . . ." While Capp Care is not an insurance company, and
Capp Care does not issue insurance policies, all of the stock of Capp
Care is owned by six insurance companies. Also, Capp Care adminis-
ters health benefit programs of various insurance company payors
(including four of its insurance company shareholders) and third party
insurer-payors (i.e., employers) throughout the United States. More-
over, the standard form of contract between Capp Care and an indi-
vidual payor (including an insurance company payor) expressly
appoints Capp Care as the payor's "Agent and Attorney-in-Fact" to
establish, manage and maintain the preferred provider organization
and network. Accordingly, Dr. Richter argues that Capp Care is sub-

_____

**1** The following definitions are pertinent:

> "Insurer" means an insurance company.

> "Insurance company" means any company engaged in the busi-
> ness of making contracts of insurance.

Id. § 38.2-100. Preferred provider policies or contracts are defined as "in-
surance policies or contracts that specify how services are to be cov-
ered." Id. § 38.2-3407E.

3

ject to the provisions of section 38.2-3407, and Capp Care, of course, disagrees.[2]

We need not and do not reach this issue, however, because we conclude that Capp Care's decision to deny Dr. Richter's application did not amount to unreasonable discrimination in violation of section 38.2-3407. We therefore affirm the district court's decision on that limited ground.

II.

A.

The following facts are taken from the trial record.

In 1991 Dr. Richter received a public reprimand from the Virginia Board of Medicine after entering into a consent order. The reprimand was in lieu of concluding formal administrative hearings in which Dr. Richter was accused of obtaining (by fraud) and possessing Schedule IV controlled substances, Ativan and Halcion.

The consent order provided that Dr. Richter agreed with the recommendations of a team of doctors that evaluated her medical condition. The recommendations specified that she should receive individual therapy, develop better methods with the help of a psychologist for dealing with stress in her life, and "[if] people still felt that alcohol and drugs were an ongoing factor in her life, than[sic] she should agree to submit to" drug testing. At trial Dr. Richter testified that she did not seek any counseling or therapy after the issuance of the reprimand because she "didn't need it."

In 1993 Capp Care contracted with various health care providers in Northern Virginia in order to establish and operate a new PPO network in Northern Virginia. Capp Care entered into an agreement with

_____

[2] The American Association of Preferred Provider Organizations has filed an amicus curiae brief in support of Capp Care's position, asserting that "the extension of section 38.2-3407 to non-insurer PPOs is contrary to public policy advocating the use of managed care organizations to provide high quality health care at reasonable costs."

Northern Virginia Provider Services, Inc. ("NVPSI"), whereby all NVPSI participating physicians would be offered the opportunity to join Capp Care's Northern Virginia PPO network and to qualify for payments as preferred providers. Under the agreement NVPSI agreed to provide its members with information concerning Capp Care's Northern Virginia PPO network, a copy of Capp Care's standard form of Provider Agreement (with Amendments thereto), and a copy of a release authorizing NVPSI to provide Capp Care with certain information for credentialing purposes.

The agreement between Capp Care and NVPSI also provided that:

> CAPP CARE agrees to accept a copy of the credentialing application and related data (including periodic updates in connection with recredentialing) submitted to NVPSI by each NVPSI physician in lieu of requiring the physician to submit a new credentialing application (or separate updates in connection with recredentialing). CAPP CARE reserves the right to request additional information in addition to the information set forth in the physician's NVPSI application and reserves the right to make all final decisions as to whether a physician participates in the network. Any request by CAPP CARE for additional information in connection with initial credentialing or recredentialing NVPSI members must be made to NVPSI and CAPP CARE must demonstrate that such additional information is reasonably necessary for its credentialing decisions.

Dr. Richter is a member of NVPSI. In contemplation of the formal signing of the Capp Care/NVPSI agreement, NVPSI sent its members a "Contract Overview" outlining the steps its members needed to take in order to become a preferred provider in Capp Care's Northern Virginia PPO network.

The Contract Overview explained that Capp Care would enter into individual contracts with those members of NVPSI who wished to become preferred providers. The Contract Overview further explained (1) that "NVPSI physicians who elect to participate in this arrangement will be notified by Capp Care of their effective date following submission of a signed Provider Agreement and Capp Care's review

5

of credentialing information," (2) that "[a]ll NVPSI physicians are eligible to participate with Capp Care as preferred providers, subject to review of physician credentials by Capp Care," and (3) that "Capp Care has agreed to rely on NVPSI's physician information in connection with initial credentialing in lieu of submission of a Capp Care physician application."

Dr. Richter signed the Provider Agreement and authorized NVPSI to release her credentialing information. Evidently, the credentialing information did not include information concerning Dr. Richter's public reprimand because the reprimand did not fall into any category of information about which Dr. Richter was required to inform NVPSI or about which NVPSI was required to inform Capp Care. Using publicly available information, however, Capp Care learned of Dr. Richter's reprimand and rejected her application to become a preferred provider.[3]

This was not the first time that Dr. Richter had failed to gain acceptance in a PPO in the aftermath of her public reprimand. Since 1991 she had been rejected by PPOs or HMO networks on several occasions, and her membership in two PPOs had been terminated. Nevertheless, after making several attempts to have Capp Care reconsider its decision, Dr. Richter filed her complaint alleging that Capp Care violated Virginia's Any Willing Provider Law, Va. Code Ann. § 38.2-3407.

B.

The district court rejected Dr. Richter's claim. The court found that Dr. Richter "was informed, in writing, that as one of the terms and conditions for membership she would have to be credentialed by Capp Care. She similarly was advised that acceptance of her application was contingent upon such credentialing by Capp Care." Richter, 868 F. Supp. at 165. The district court further found that "Capp Care rejects the applications of all physicians who have been disciplined by state medical boards for conduct of the type for which plaintiff was

_____

[3] Specifically, Capp Care learned of the disciplinary action against Dr. Richter through a book entitled 9479 Questionable Doctors and newspaper articles received from a clipping service.

6

reprimanded" and that Capp Care will reconsider such applications "where the physician provides documentation he or she has undergone treatment for the conditions which caused the conduct." Id.

The district court then found that "Capp Care rejected plaintiff's application because of her reported disciplinary action by the Virginia Board of Medicine" and that "Capp Care's use, in the credentialing process, of information about plaintiff's disciplinary action is consistent with credentialing practices throughout the medical community." Id. The court also found that the publicly available information upon which Capp Care relied in rejecting Dr. Richter's application "provided reliable reports of plaintiff's reprimand and the findings of the Virginia Board of Medicine in the `Consent Order.'" Id.

Based on the foregoing, the district court concluded that "Capp Care communicated to plaintiff, through NVPSI, the fact that credentialing by Capp Care was a term and condition of acceptance" and that "Capp Care's credentialing policy to deny the applications of physicians who have been disciplined for professional misconduct, did not discriminate unreasonably against plaintiff." Id. at 167. The court emphasized that Dr. Richter had failed to show that "Capp Care accepted the applications of other similarly situated physicians who were disciplined by the Virginia Board of Medicine or that Capp Care's consideration, in its credentialing, of her reprimand by the Virginia Board of Medicine for professional misconduct is an unreasonable criterion." Id. The district court therefore entered judgment in favor of Capp Care.

On appeal Dr. Richter challenges these factual findings and legal conclusions. She claims that "credentialing" by Capp Care was not a term and condition for membership in Capp Care's Northern Virginia PPO and that Capp Care agreed not to examine any credentialing information other than that provided by NVPSI. In addition, Dr. Richter claims that the public information relied upon by Capp Care was not reliable, that as a fully licensed physician she was prepared to comply with all terms and conditions for membership in Capp Care's Northern Virginia PPO, and that Capp Care had accepted physicians in the past who had been disciplined for matters related to substance abuse. Thus, Dr. Richter believes that the terms and conditions under

7

which Capp Care rejected her application unreasonably discriminated against her in violation of section 38.2-3407.

III.

We review the district court's findings of fact under the "clearly erroneous" standard, Fed. R. Civ. P. 52(a), and we review de novo the district court's conclusions of law. E.g., Salve Regina v. Russell, 499 U.S. 225, 231 (1991). Findings of fact are clearly erroneous only when the reviewing court, after having considered all of the evidence, is "left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co., 333 U.S. 364, 395 (1948). No such mistake has been made here.

A.

The trial record shows that Dr. Richter was on notice that credentialing was a term and condition for her acceptance as a preferred provider in Capp Care's Northern Virginia PPO. In particular, the Provider Agreement expressly stated that Capp Care"reserves the right to make all final decisions as to whether a physician participates in the network." Likewise, the Contract Overview provided to Dr. Richter stated that credentialing was a term and condition that had to be met before Capp Care would accept a preferred provider application. Accordingly, we agree with the district court that "Capp Care communicated to plaintiff, through NVPSI, the fact that credentialing by Capp Care was a term and condition of acceptance."

Faced with this evidence, Dr. Richter argues that in making its credentialing decisions Capp Care agreed not to examine any information other than that provided by NVPSI. Therefore, according to Dr. Richter, Capp Care could not examine publicly available information when making its credentialing decision. We cannot accept Dr. Richter's argument.

While it is true that Capp Care agreed that it would rely upon a physician's NVPSI application in connection with initial credentialing and that any request for additional information in connection with credentialing would be made to NVPSI, nowhere did Capp Care waive

8

the right to look at relevant information -- especially publicly available information. Indeed, when read in context, both the Provider Agreement and Contract Overview make clear that Capp Care merely agreed that it would look to NVPSI to obtain credentialing information and that Capp Care would not request additional credentialing information directly from a physician. Capp Care did not, however, agree to base its credentialing decisions exclusively upon information provided by NVPSI or to refrain from examining information readily available to any member of the public.

Furthermore, it is reasonable (and obvious) to assume that Capp Care would examine publicly available information bearing on the fitness of an applicant to practice medicine. And, of course, Dr. Richter knew that her reprimand was public information and that other PPOs had rejected her application to become a preferred provider as a consequence of her reprimand. It therefore should not have come as any surprise to Dr. Richter that Capp Care would take her public reprimand into account in making its credentialing decision. Accordingly, we will not disturb the district court's decision on this ground.

B.

Dr. Richter also argues that it was improper for Capp Care to rely upon newspaper articles describing the disciplinary action against her because there were conflicts between the reports in different newspapers and that Capp Care should have followed up with an independent investigation of its own. There is no dispute that Dr. Richter was publicly reprimanded by the Virginia Board of Medicine. Therefore, so long as Capp Care did not discriminate unreasonably against Dr. Richter when it rejected her application based on that reprimand, it is of no consequence whether there were actual conflicts in the newspaper clippings or whether it would have been better if Capp Care had conducted its own investigation.

Dr. Richter contends, however, that discrimination occurred here because she continues to be fully licensed to practice medicine in Virginia, and thus Capp Care was obligated to accept her application. That argument makes little sense. In effect, it would eviscerate Virginia's Any Willing Provider Law by precluding a PPO from setting any term or condition for acceptance other than one ensuring that a

9

preferred provider is licensed to practice medicine. Virginia certainly intended -- and section 38.2-3407 makes clear-- that a PPO may demand that their preferred providers meet standards above merely being licensed to practice medicine.

Here, the trial record shows that the Virginia Board of Medicine publicly reprimanded Dr. Richter after she was accused of obtaining (by fraud) and possessing Schedule IV controlled substances. The public reprimand was part of a consent order to which Dr. Richter agreed in lieu of concluding the formal administrative hearings instituted against her. True, Dr. Richter did not lose her medical license as a result of the reprimand, but this does not mean that Capp Care violated Virginia's Any Willing Provider Law when it rejected her application based on that reprimand.

Similarly, the fact that Capp Care had accepted applications from other physicians who had been disciplined for matters related to substance abuse does not mean that Capp Care discriminated unreasonably when it refused to accept Dr. Richter's application. Dr. Richter testified at trial that she has not received any counseling or therapy since the issuance of the reprimand because she"didn't need it." Yet, as the district court found, "Capp Care rejects the applications of all physicians who have been disciplined by state medical boards for conduct of the type for which plaintiff was reprimanded," but Capp Care will reconsider such applications "where the physician provides documentation he or she has undergone treatment for the conditions which caused the conduct." Richter, 868 F. Supp. at 165. Dr. Richter has not demonstrated to us that these factual findings are clearly erroneous. We, therefore, agree with the district court that Capp Care's decision to reject Dr. Richter's application did not violate Virginia's Any Willing Provider Law.

IV.

Based on the foregoing, the judgment of the district court is affirmed.

AFFIRMED

10